1 | McGREGOR W. SCOTT
United States Attorney
2 | MICHAEL D. ANDERSON
ROSANNE L. RUST
3 | Assistant United States Attorneys
501 I Street, Suite 10-100
4 | Sacramento, CA 95814
Telephone: (916) 554-2700
5 | Facsimile: (916) 554-2900

6 | Attorneys for Plaintiff
United States of America

**FILED**

MAY 10 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:18-CR-77 TLN |
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT ALEX GOLDMAN |
| v. | DATE: May 10, 2018 |
| ALEX GOLDMAN, | TIME: 9:30 A.M. |
| Defendant. | COURT: THE HONORABLE TROY L. NUNLEY |

## I. INTRODUCTION

### A. Scope of Agreement.

The Information in this case charges the defendant with a violation of 18 U.S.C. § 371, Conspiracy to Commit an Offense. This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B. Court Not a Party.

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in

PLEA AGREEMENT – ALEX GOLDMAN     1

1 the Information. The Court is under no obligation to accept any recommendations made by the
2 government, and the Court may in its discretion impose any sentence it deems appropriate up to and
3 including the statutory maximum stated in this plea agreement.

4 If the Court should impose any sentence up to the maximum established by the statute, the
5 defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all
6 of the obligations under this plea agreement. The defendant understands that neither the prosecutor,
7 defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will
8 receive.

9 **II. DEFENDANT'S OBLIGATIONS**

10 **A. Guilty Plea.**

11 The defendant will plead guilty to Count One of the Information, which is attached hereto as
12 Exhibit B, charging a violation of 18 U.S.C. § 371, Conspiracy to Commit an Offense. The defendant
13 agrees that he is in fact guilty of this charge and that the facts set forth in the Factual Basis for Plea
14 attached hereto as Exhibit A are accurate.

15 The defendant agrees that this plea agreement will be filed with the Court and become a part of
16 the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his
17 plea should the Court not follow the government's sentencing recommendations.

18 The defendant agrees that the statements made by him in signing this Agreement, including the
19 factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by
20 the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a
21 guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f)
22 and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this
23 Agreement generally.

24 1. Waiver of Indictment:

25 The defendant acknowledges that under the United States Constitution he is entitled to be
26 indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed.R.Crim.P.
27 7(b) he agrees to waive any and all rights he has to being prosecuted by way of indictment to the charges
28 set forth in the information. The defendant agrees that at a time set by the Court, he will sign a written

1   waiver of prosecution by indictment and consent to proceed by information rather than by indictment.

2         2.    Consent to Venue:

3       The defendant agrees to voluntarily consent to venue in the Eastern District of California as to

4   the charge of Conspiracy to Commit an Offense in violation of 18 U.S.C. § 371. The defendant agrees

5   to give up any defense based on venue in this District.

6         3.    Package Agreement:

7       The defendant acknowledges and understands that the plea offer made to him here by the

8   government is a "package offer." That is, the defendant understands that the offer made to him is

9   conditioned on co-defendant House of Oxford pleading guilty according to the terms of its respective

10   plea offer. The defendant understands that if this co-defendant declines, refuses or fails to plead guilty

11   according to its respective offer, then, at the option of the government, the defendant will not be allowed

12   to enter a plea of guilty to the offer made to him by the government. Additionally, if co-defendant

13   House of Oxford fails or refuses to enter its plea according to its respective offer and the defendant has

14   already entered his plea, then this plea agreement is voidable at the option of the government. In its sole

15   discretion, the government has the ability to withdraw from the plea agreement with the defendant and

16   pursue any charges it deems appropriate as to this defendant. However, the defendant's waiver of his

17   rights under Rule 11(f) and Fed. R. Evid. 410, as set forth in Section II.A herein, will not operate.

18       Recognizing that this is a package offer, the defendant confirms that he has not been

19   threatened, pressured, or coerced by any other person, including the co-defendant entity or officers, to

20   enter into this plea agreement. The defendant also confirms that he enters into this plea agreement

21   voluntarily because he is in fact guilty of the offense to which he is pleading guilty.

22         4.    Timing of Entry of Plea

23       The parties anticipate that this agreement will be accepted by the defendant and signed by

24   the parties prior to the filing of the information or the entry of plea in Court. After accepting and

25   signing this agreement, the government shall retain the original signed copy pending ongoing

26   cooperation. Copies of the signed Plea Agreement will be provided to counsel for the defendant.

27   ///

28   ///

**B.**     **Restitution.**

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses. The defendant agrees the conduct to which he is pleading guilty requires mandatory restitution pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii), and agrees to pay restitution to the victim for the total loss to the victim as a result of the scheme. The victim in this case is the former California State Board of Equalization, which the component parts are now the California Department of Tax and Fee Administration.

The parties stipulate and agree that the defendant's restitution obligation is satisfied in whole by the completion of the forfeiture of the assets set forth in Section II.F of this agreement, which the parties estimate have a value approximately of $14 million.[1] This amount is owed jointly and severally with co-defendant House of Oxford. Defendant further agrees that he will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

**C.**     **Fine.**

The parties agree that given the substantial restitution and forfeiture no fine should be imposed.

**D.**     **Special Assessment.**

The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. The defendant understands that this plea agreement is voidable at the option of the government if he fails to pay the assessment prior to that hearing.

**E.**     **Violation of Plea Agreement by Defendant/Withdrawal of Plea.**

If the defendant, cooperating or not, violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government. The government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. One way a cooperating defendant violates the plea agreement is to commit any crime or provide any statement or testimony which proves to be

---

[1] In a separate letter, that has already been delivered, the former California State Board of Equalization has agreed that the forfeiture of these assets will satisfy its restitution and civil claims as to Alex Goldman, Mark Goldman, and House of Oxford only, and not to any other individual or entity.

PLEA AGREEMENT – ALEX GOLDMAN     4

1  knowingly false, misleading, or materially incomplete. Any post-plea conduct by a defendant
2  constituting obstruction of justice will also be a violation of the agreement. The determination whether
3  the defendant has violated the plea agreement will be under a probable cause standard.

4      If the defendant violates the plea agreement, withdraws his plea, or tries to withdraw his plea, the
5  government shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded
6  guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file
7  any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter
8  be subject to prosecution for any federal criminal violation of which the government has knowledge,
9  including perjury, false statements, and obstruction of justice. The decision to pursue any or all of these
10  options is solely in the discretion of the United States Attorney's Office.

11      By signing this plea agreement, the defendant agrees to waive any objections, motions, and
12  defenses that the defendant might have to the government's decision. Any prosecutions that are not
13  time-barred by the applicable statute of limitations as of the date of this plea agreement may be
14  commenced in accordance with this paragraph, notwithstanding the expiration of the statute of
15  limitations between the signing of this plea agreement and the commencement of any such prosecutions.
16  The defendant agrees not to raise any objections based on the passage of time with respect to such
17  counts including, but not limited to, any statutes of limitation or any objections based on the Speedy
18  Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as
19  of the date of this plea agreement.

20      In addition, (1) all statements made by the defendant to the government or other designated law
21  enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,
22  whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or
23  administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no
24  claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal
25  Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by
26  the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed.
27  By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

28

PLEA AGREEMENT – ALEX GOLDMAN          5

**F.    Forfeiture.**

The defendant has already signed Stipulations for Final Judgments of Forfeiture and/or Consent Judgments of Forfeiture in *U.S. v. Approximately $538,155.00 seized from ING Direct Checking Account # 156773818, et al.*, and related civil forfeitures cases, forfeiting to the United States all of his right, title, and interest in the defendant assets referenced in those civil forfeiture cases, as well as in Exhibit C attached hereto.

Defendant agrees not to file a claim to any of the assets in any civil proceeding, administrative or judicial, which was already initiated.

The parties agree that any portion of net proceeds from the forfeited assets that are paid to victims through the remission or restoration process, will be credited to the defendant's restitution obligation.

**G.    Agreement to Cooperate.**

The defendant agrees to cooperate fully with the government and any other federal, state, or local law enforcement agency, as directed by the government. As used in this plea agreement, "cooperation" requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews, in correspondence, telephone conversations, before a grand jury, or at any trial or other court proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the defendant's presence is requested by the government or compelled by subpoena or court order; (3) to produce voluntarily any and all documents, records, or other tangible evidence requested by the government; (4) not to participate in any criminal activity while cooperating with the government; and (5) to disclose to the government the existence and status of all money, property, or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal activities or the illegal activities of any conspirators.

### III.    THE GOVERNMENT'S OBLIGATIONS

**A.    Dismissals.**

The government agrees not to file additional charges against the defendant stemming from the conduct set forth in the Factual Basis for Plea except if this agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Plea(s)), III.B.3

1  (Reduction of Sentence for Cooperation), VI.B (Guidelines Calculations), and VII.B (Waiver of Appeal

2  and Collateral Attack) herein.

3     **B.    Recommendations.**

4        1.    Incarceration Range.

5        The government will recommend that the defendant be sentenced to the low end of the

6  applicable guideline range as determined by the Court.

7        2.    Acceptance of Responsibility.

8        The government will recommend a two-level reduction (if the offense level is less than

9  16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if

10 the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. §

11 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of

12 the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging

13 in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the

14 preparation of the pre-sentence report or during the sentencing proceeding.

15       3.    Reduction of Sentence for Cooperation.

16       The government agrees to recommend at the time of sentencing that the defendant's

17 sentence of imprisonment be reduced by up to 50% of the applicable guideline sentence if he provides

18 substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1. The defendant understands that

19 he must comply with paragraphs II.G and not violate this plea agreement as set forth in paragraph II.E

20 herein. The defendant understands that it is within the sole and exclusive discretion of the government

21 to determine whether the defendant has provided substantial assistance.

22       The defendant understands that the government may recommend a reduction in his

23 sentence of less than 50% or no reduction at all; depending upon the level of assistance the government

24 determines that the defendant has provided.

25       The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a

26 recommendation and is not binding on the Court, that this plea agreement confers no right upon the

27 defendant to require that the government make a § 5K1.1 motion, and that this plea agreement confers

28 no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion. In

PLEA AGREEMENT – ALEX GOLDMAN          7

particular, the defendant agrees not to try to file a motion to withdraw his guilty plea based on the fact that the government decides not to recommend a sentence reduction or recommends a sentence reduction less than the defendant thinks is appropriate.

If the government determines that the defendant has provided further cooperation within one year following sentencing, the government may move for a further reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

**C. Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

Further, other than as set forth above, the government agrees that any incriminating information provided by the defendant during his cooperation will not be used in determining the applicable guideline range, pursuant to U.S.S.G. § 1B1.8, unless the information is used to respond to representations made to the Court by the defendant, or on his behalf, that contradict information provided by the defendant during his cooperation.

## IV. ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty, Conspiracy to Commit an Offense in violation of 18 U.S.C. § 371:

First, beginning in or about March 2006, and ending in or about April 2013, there was an agreement between two or more persons to commit mail fraud as charged in the information;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act in or after March 2006 for the purpose of carrying out the conspiracy.

The elements of the charge of Mail Fraud are as follows:

First, the defendant made up a scheme or plan for obtaining money or property by making false promises or statements;

Second, the defendant knew that the promises or statements were false;

Third, the promises or statements were material, that is they would reasonably influence a person to part with money or property;

Fourth, the defendant acted with the intent to defraud;

Fifth, the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

The defendant fully understands the nature and elements of the crimes charged in the Information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.     MAXIMUM SENTENCE

**A.     Maximum Penalty.**

The maximum sentence that the Court can impose is five years of incarceration, the greater of a fine of $250,000, or not greater than twice the gross gain or the gross loss from the offense, a three year period of supervised release and a special assessment of $100. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

**B.     Violations of Supervised Release.**

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to two additional years imprisonment.

## VI.     SENTENCING DETERMINATION

**A.     Statutory Authority.**

The defendant understands that the Court must consult the Federal Sentencing Guidelines and

must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B.** **Stipulations Affecting Guideline Calculation:**

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

1. Base Offense Level: 6

The parties stipulate that U.S.S.G. § 2B1.1 applies to this offense.

2. Loss Amount: +20

U.S.S.G. § 2B1.1(b)(1)(K). The parties stipulate that the provable loss was approximately $14,000,000.

3. Obstruction: +0 to 2

U.S.S.G. § 3C1.1. No stipulation, the parties are free to make whatever recommendation they believe appropriate.

4. Acceptance of Responsibility: See paragraph III.B.2 above

5. Criminal History: No stipulation.

6. Departures or Other Enhancements or Reductions:

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or an adjustment based on the defendant's cooperation (§5K1.1). Both parties agree not to move for, or argue in support of, any departure from the Sentencing Guidelines, or any deviance or variance from the

1 | Sentencing Guidelines under United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

2 |        The defendant is free to recommend to the Court whatever sentence he believes is
3 | appropriate under 18 U.S.C. § 3553(a). The government is not obligated to recommend any specific
4 | sentence, but must recommend a sentence consistent with its obligations under the other provisions of
5 | this plea agreement.

6 | **VII. WAIVERS**

7 | **A.  Waiver of Constitutional Rights.**

8 |        The defendant understands that by pleading guilty he is waiving the following constitutional
9 | rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to
10 | be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to
11 | testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be
12 | compelled to incriminate himself.

13 | **B.  Waiver of Appeal and Collateral Attack.**

14 |        The defendant understands that the law gives the defendant a right to appeal his guilty plea,
15 | conviction, and sentence. The defendant agrees as part of his plea, however, to give up the right to
16 | appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not
17 | exceed the statutory maximum for the offense to which he is pleading guilty. The defendant specifically
18 | gives up the right to appeal any order of restitution the Court may impose.

19 |        Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if
20 | one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the
21 | statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant
22 | understands that these circumstances occur infrequently and that in almost all cases this Agreement
23 | constitutes a complete waiver of all appellate rights.

24 |        In addition, regardless of the sentence the defendant receives, the defendant also gives up any
25 | right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any
26 | aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

27 |        Notwithstanding the agreement in paragraph III.A above that the government will not file
28 | additional charges against the defendant, if the defendant ever attempts to vacate his plea, dismiss the

1   underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading

2   guilty, the government shall have the rights set forth in Section II.E herein.

3   **C.    Waiver of Attorneys' Fees and Costs.**

4   The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

5   119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

6   investigation and prosecution of all charges in the above-captioned matter and of any related allegations

7   (including without limitation any charges to be dismissed pursuant to this plea agreement and any

8   charges previously dismissed).

9   **D.    Impact of Plea on Defendant's Immigration Status.**

10   Defendant recognizes that pleading guilty may have consequences with respect to his

11   immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes

12   are removable offenses, including offense to which the defendant is pleading guilty. Removal and other

13   immigration consequences are the subject of a separate proceeding, however, and defendant understands

14   that no one, including his attorney or the district court, can predict to a certainty the effect of his

15   conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty

16   regardless of any immigration consequences that his plea may entail, even if the consequence is his

17   automatic removal from the United States.

18   **VIII.    ENTIRE PLEA AGREEMENT**

19   Other than this plea agreement, no agreement, understanding, promise, or condition between the

20   government and the defendant exists, nor will such agreement, understanding, promise, or condition

21   exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and

22   counsel for the United States.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

# IX. APPROVALS AND SIGNATURES

**A.** **Defense Counsel.**

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: 5-10-18

_____
TOM JOHNSON
Attorney for Defendant

**B.** **Defendant:**

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: 5/10//8

_____
ALEX GOLDMAN
Defendant

**C.** **Attorney for United States:**

I accept and agree to this plea agreement on behalf of the government.

Dated: 5/7/18

McGREGOR W. SCOTT
United States Attorney

_____
MICHAEL D. ANDERSON
ROSANNE L. RUST
Assistant United States Attorneys

EXHIBIT "A"

Factual Basis for Plea

## I. BRIEF FACTUAL SUMMARY

From about March 2006 through April 2013, Alex GOLDMAN, acting as an officer of House of Oxford (a tobacco distributor in New Jersey), conspired with multiple individuals, including other House of Oxford independent contractors and employees, such as E.H. and P.K., and businesses operating in California, in providing untaxed OTP with the knowledge that this product would be sold illegally (without payment of state excise tax) in the State of California. These individuals included M.S. and N.N., both of whom purchased OTP under multiple business names and addresses in an effort to conceal their purchases and neither of whom, during a portion or the entirety of their relationship with GOLDMAN, could legally purchase untaxed OTP.

From about March 2006 through October 2008, House of Oxford sold M.S. and an individual directing M.S. about $32.6 million in OTP, with a resulting loss to the State of California of approximately $14 million in unpaid excise taxes. M.S. purchased this OTP using the business names of Tobacco House, KS Wholesale, Discounted Tobacco, and Cheap Cig Distributor.

From about April 2009 through April 2010, House of Oxford sold N.N. about $2 million in OTP, with a resulting loss to the State of California of about $895,220 in unpaid excise taxes. N.N. purchased this OTP using the business names of K&L Tobacco Industries, PH Wholesale, Eli Distribution, LB Wholesale, LT Wholesale, RW Wholesale, and LQ Tobacco.

From about May 2012 through April 2013, Harold Levinson and Associates, Inc., ("HLA"), using House of Oxford as a commissioned sales person, sold an undercover ATF Agent (U/C Agent) about $695,737 in OTP, believing that it would be sold without payment of excise tax in the State of California. Because this product was never distributed into California, no actual tax loss was incurred by the state. Had the product been sold into California as intended, the loss would have been approximately $229,593.

## II. SUMMARY OF EVIDENCE

### A. California OTP Law

In California, and at the period of time in question, non-cigarette tobacco (known as Other Tobacco Product, or OTP) was taxed at a rate of about 46% (3/06-6/07), 45% (7/07 – 6/09), 41% (7/09 – 6/10), 33% (7/10-6/11), 32% (7/11-6/12), and 31% (7/12-4/13). Nobody can possess untaxed tobacco in the state unless that person has a tobacco distributor's license from the State of California Board of Equalization (BOE). Such a license would require that the licensee report to the BOE once a month the amount of tobacco sold in the state, and then pay the taxes on it shortly thereafter.

### B. M.S.

M.S. began buying OTP from GOLDMAN in 2005, at the direction of an individual in California, M.H.K. At the time M.S. began buying OTP from GOLDMAN, M.S. was operating a retail store in Tennessee. M.H.K. held only a wholesale license and could not buy or possess untaxed OTP in California.

M.S. met with GOLDMAN in early 2006, at which time GOLDMAN asked M.S. about M.S.'s customers. M.S. told GOLDMAN that M.S. had a small customer in Georgia but that his primary customer was in California, and that the bulk of the product was being shipped there. GOLDMAN offered to ship the product directly to California for M.S. and to cover the cost of shipping. GOLDMAN then shipped the product to California for M.S., but billed the product to Tennessee. The

1   tax returns submitted by House of Oxford showed the product shipped to California, but to an address
  that was not licensed by BOE to possess/sell tobacco. This assisted M.H.K. and M.S. in evading the
2   California excise tax because there was no record reported to a government agency identifying the
  ultimate California recipient of the tobacco.

3

     In late 2006, M.S. moved to California and continued to buy OTP from GOLDMAN until late
4   2008. M.S. would sometimes pay for an order using checks from multiple business names.

5      M.S. moved back to Tennessee and stopped buying from GOLDMAN briefly, but then resumed
  until late 2009. M.S. has testified that GOLDMAN asked M.S. if M.S. had a distributor's license, but
6   then sold product to M.S. despite M.S. having only a retail business license. GOLDMAN continued to
  ship product directly to California while billing it to an unlicensed address in California.

7

     C. N.N.
8

     N.N. began buying OTP from GOLDMAN in April 2009. She originally started a business
9   called K&L Tobacco Industries, and from 2009 through March 2010, she purchased OTP from
  GOLDMAN under this name and at least six other names and addresses, Only one of N.N.'s business
10   entities held a distributor's license, and this license was only active from August 18, 2009 through
  September 29, 2010. Several of the business names that N.N. used never held any type of license with
11   BOE or were held by individuals other than N.N. N.N., like M.S., also went to New Jersey and met
  GOLDMAN at his place of business.
12

     N.N. has testified that two of GOLDMAN's employees, on different occasions, educated her on
13   how to receive product without the state's knowledge, including instructing her to have product shipped
  to residences and to pay with money orders. N.N. also states that she was told on multiple occasions
14   that House of Oxford did not have to report its sales to the State of California, so she would not have to
  worry about being "caught" by the state taxing authorities.
15

     House of Oxford sales people acting under the direction of GOLDMAN shipped product to N.N.
16   approximately 125 times during this time period, according to UPS records, and the majority of the
  shipments went to residences belonging to N.N.'s relatives. N.N. testified that GOLDMAN and/or his
17   employees helped her come up with some of the business names she used.

18      N.N. stopped buying from GOLDMAN in 2010, after she was contacted by ATF task force
  members. When she stopped buying, she was contacted by one of GOLDMAN's employees, who
19   questioned her several times about why she was not placing an order and expressed concern that she
  might have had a "visit" from a state investigator.
20

     D. Sales to U/C Agent
21

     In December 2011, GOLDMAN met an ATF U/C Agent in Las Vegas, Nevada. It had
22   previously been represented to GOLDMAN that the U/C Agent's "partner" (a licensed distributor
  known to GOLDMAN) could no longer buy OTP in California, because the latter had been "raided" by
23   BOE. GOLDMAN had consequently suggested the meeting. By this date, GOLDMAN had sold House
  of Oxford's customer list to HLA as part of an asset purchase arrangement but remained actively
24   involved with the former House of Oxford customers, and collected a commission based on HLA sales
  to House of Oxford customers.
25

     In a recorded conversation, GOLDMAN stated that they had to "collectively" figure out how to
26   get the U/C Agent and his partner back into business. GOLDMAN then suggested that they should
  consider getting a tobacco distributor's license in Arizona. GOLDMAN stated that HLA could then ship
27   product to the license in Arizona, and that what happened to it after that was something that he
  (GOLDMAN) would have "no knowledge" of. GOLDMAN also stated that his "guess was that [they
28   were] not really doing any business in Arizona," but that Arizona was a state where HLA could ship

1  OTP without payment of tax, and that they would then just need "to figure out how to get it from Point
   A to Point B." GOLDMAN later suggested that the U/C Agent should get a "guy" to drive the product
2  to Los Angeles, California, and stated that he would try to find a way to compensate them for the extra
   cost of having to ship the product from Arizona to California.

3
          The U/C Agent expressed concern about ATF and BOE looking at HLA's records and finding
4  out how much product was previously purchased in California. GOLDMAN replied that if HLA
   received a request, the records would show only that the product was shipped, and that the U/C Agent
5  could create fraudulent records showing that the product had been shipped out to another state (thus
   negating the tax liability). GOLDMAN stated that they could do the same thing in Arizona as they had
6  been doing in California, reporting the product was sold out of state or to another distributor, "whatever
   the dance was...." GOLDMAN also promised to alert the U/C Agent if HLA ever did receive a request
7  for records.

8          Based on GOLDMAN's advice, the U/C Agent obtained a license and a warehouse in Arizona
   under a different name and began to receive shipments of OTP from HLA. Several times, the U/C
9  Agent talked to one of GOLDMAN's salesmen, and complained about the time and cost of gas required
   to drive the product from Arizona to California. Each time, the salesman would promise to talk to
10 GOLDMAN about cutting the prices.

11          On March 18, 2013, a Grand Jury subpoena was sent via facsimile machine to House of Oxford.
   A similar subpoena was also mailed to HLA. On April 9, 2013, GOLDMAN's salesman told the U/C
12 Agent that GOLDMAN was going to be in Las Vegas later that month, and that it would be a good
   opportunity for the U/C Agent to meet with GOLDMAN. The U/C Agent met GOLDMAN on April 23,
13 2013. GOLDMAN told the U/C Agent that GOLDMAN had received a request for business records
   related to the U/C Agent, his partner, and the business in Arizona. GOLDMAN then pulled up a copy of
14 the subpoena on his cell phone and read it to the U/C Agent. GOLDMAN admitted that he had received
   the faxed copy and that he had been "lucky" because someone had placed the HLA copy in his mailbox
15 at the business, and he had been able to intercept it.

16          The U/C Agent asked GOLDMAN about getting a license under a different name, and
   GOLDMAN stated that he would continue to do business with the U/C Agent and would continue to
17 give him the same discounts as before.

18          GOLDMAN told the U/C Agent that the government investigation was a "money grab" and that
   the U/C Agent should get a tax lawyer and negotiate a financial settlement, after which the U/C Agent
19 could resume doing some "legitimate business, tax paid," but "find the other business also."
   GOLDMAN stated he would support the U/C Agent in that endeavor and that if GOLDMAN's salesman
20 gave him paperwork and told him that it was related to the U/C Agent, that GOLDMAN would approve
   it and continue doing business with him.

21
          E.  Examples of the Use of the Mails
22
          Cheap Cig filed monthly returns to BOE from December 2006 through August 2008. The last
23 return was mailed on August 25, 2008, for the reporting period of July 2008. This last return showed a
   zero amount for taxable distributions, despite M.S. having purchased $1,017,464 in untaxed OTP that
24 month.

25          The only business under which N.N. filed returns was K&L. A large batch of returns was faxed
   to BOE on or around April 13, 2010, after N.N. was contacted by ATF task force members, covering the
26 period August 2009 through March 2010. On August 25, 2010, K&L's accountant mailed two more
   returns for the months of April and May 2010. On September 1, 2010, the accountant mailed three more
27 returns for the months of June, July, and August 2010. All of N.N.'s returns were factually inaccurate,
   and typically reported zero or less than 10% of the actual product that she had received.
28

F. Overt Acts

HLA entered into an asset purchase agreement with HOX to purchase HOX's inventory and customers on October 8, 2010. As part of this arrangement, defendants ALEX GOLDMAN, HOX, and E.H. and P.K. continued to service HOX's customers, whose orders were then fulfilled by HLA. GOLDMAN remained actively involved the transactions made to the U/C Agent, including being involved in recommending to HLA the prices for the product, and GOLDMAN received a commission from each transaction.

GOLDMAN and HOUSE OF OXFORD orchestrated the following shipments to ATF U/C in furtherance of the conspiracy:

    1.    On or about May 14, 2012, HLA shipped $139,913 worth of OTP to the warehouse in Glendale, Arizona.

    2.    On or about June 12, 2012, HLA shipped $159,000 worth of OTP to the warehouse in Glendale, Arizona.

    3.    On or about August 28, 2012, HLA shipped $299,716.70 worth of OTP to the warehouse in Glendale, Arizona.

    4.    On or about February 20, 2013, HLA shipped $97,647.80 worth of OTP to the warehouse in Glendale, Arizona.

On or about April 9, 2013, E.H. called the U/C Agent and told him that GOLDMAN was going to be in Las Vegas, Nevada, for a tobacco trade show between April 22-24, 2013, and that it would be a good opportunity for the U/C Agent to meet with GOLDMAN and "put some business together."

On or about April 23, 2013, GOLDMAN met with the U/C Agent at the Bellagio Hotel in Las Vegas, Nevada. During that meeting, GOLDMAN told the U/C Agent that HLA would sell to anyone with a legitimate distributor's license. With that in mind, if the U/C Agent got another license in a different name, GOLDMAN stated he would continue to do business with the U/C Agent under that new name, and GOLDMAN would just give the U/C Agent the same discounts as before.

I, Alex Goldman, have carefully reviewed the above statement with my attorney. As far as my own conduct is concerned, the facts described above are true and I adopt this Factual Basis for Plea as my own true statement.

Dated: 5/1•/1 ℓ

                                     ALEX GOLDMAN
                                     Defendant

McGREGOR W. SCOTT
United States Attorney
MICHAEL D. ANDERSON
ROSANNE L. RUST
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
| Plaintiff, | |
| v. | VIOLATIONS: 18 U.S.C. § 371 – Conspiracy |
| ALEX GOLDMAN, AND HOUSE OF OXFORD, INC., | |
| Defendants. | |

I N F O R M A T I O N

COUNT ONE: [18 U.S.C. § 371 – Conspiracy]

The United States Attorney charges: T H A T

ALEX GOLDMAN, AND
HOUSE OF OXFORD, INC.,

defendants herein as follows:

1. Beginning no later than in or about March 2006, and continuing to in or about April 2013, in the State and Eastern District of California and elsewhere, the defendants ALEX GOLDMAN and HOUSE OF OXFORD, INC. (hereinafter, HOX), through its officer, ALEX GOLDMAN, did

1  knowingly combine, conspire and agree with HOX independent contractors and employees, E.H. and

2  P.K. and customers, N.N., M.S., and M.H.K., to commit an offense against the United States of

3  America, that is: mail fraud, in violation of Title 18, United States Code, Section 1341.

## I.   PARTIES, RELEVANT PERSONS, ENTITIES

5      At all times relevant to this Information:

6      2.      HOX was a company licensed to do business in the State of New Jersey with its principal

7  place of business in New Jersey. Defendant HOX was engaged in the business of distributing "Other

8  Tobacco Products," hereinafter OTP. OTP consists of tobacco products other than cigarettes such as

9  cigars, chewing tobacco, and leaf tobacco.

10     3.      Defendant ALEX GOLDMAN was the President of HOUSE OF OXFORD.

11     4.      HAROLD LEVINSON & ASSOCIATES, INC., (hereinafter HLA) was a corporation

12  that entered into an asset purchase agreement with HOX to purchase HOX's inventory and customers on

13  October 8, 2010. As part of this arrangement, defendants ALEX GOLDMAN and HOX continued to

14  service HOX's customers, whose orders were then fulfilled by HLA. GOLDMAN received a

15  commission from sales to these customers and was responsible for recommending the prices at which

16  the product was sold to them.

17     5.      California law required that every person who desired to engage in the sale of OTP had to

18  obtain a license from the California State Board of Equalization ("BOE"), now renamed the California

19  Department of Tax and Fee Administration ("CDTFA"). In California, only a person who held a valid

20  OTP distributor's license could possess OTP upon which the tax had not been paid. When a licensed

21  OTP distributor sold untaxed OTP in California, typically to a wholesaler, the distributor was required to

22  collect the excise tax on that OTP from the purchaser. The licensed distributor then had to submit to the

23  California State BOE in Sacramento, California, monthly reports reflecting the amount of untaxed OTP

24  purchased in the previous month and the amount of excise tax owing, together with payment in that

25  amount. The monthly reports were generally sent by U.S. mail or common carrier.

26     6.      Both tobacco distributors and tobacco wholesalers were required by California law to

27  maintain accurate records reflecting their purchase and sale of tobacco products.

28

## II.    THE OBJECTS OF THE CONSPIRACY

The objects of the conspiracy, among others, were as follows:

7.    The conspirators did devise and intend to devise a material scheme and artifice to defraud the State of California of excise tax revenue, by means of material false statements and omissions of material facts in connection with the purchase and sale of OTP.

8.    The purpose of the scheme to defraud was to conceal from the State of California taxable sales of OTP in California and thereby evade payment of the excise tax on that product.

9.    During the course of the scheme to defraud, defendants GOLDMAN and HOUSE OF OXFORD, INC. sold approximately $33.5 million in untaxed OTP for distribution within California, intending that the tax not be paid and for which the tax was not paid, thus depriving the State of California of approximately $14 million in excise tax.

## III.    MANNER AND MEANS

The manner and means of the conspiracy were, in substance, as follows:

10.    Defendants ALEX GOLDMAN and HOUSE OF OXFORD would sell untaxed OTP to N.N., M.S. and M.H.K., who were individuals wishing to distribute OTP in California, or their associated companies.  Defendants ALEX GOLDMAN and HOUSE OF OXFORD would sell untaxed OTP to an ATF Undercover Agent (U/C), who the defendants believed wished to distribute untaxed OTP in California.

11.    In order to evade paying the California excise tax, companies associated with N.N., M.S. and M.H.K. submitted by mail or common carrier monthly reports to the California Board of Equalization containing false information regarding the amount of OTP they had purchased.

12.    To make it more difficult for the BOE to find and track the OTP it was shipping, and to help its customers evade the excise tax, ALEX GOLDMAN, HOUSE OF OXFORD, E.H. and P.K. shipped OTP to California, but reported on the HOUSE OF OXFORD tax returns that the OTP was sold to a different state; shipped OTP to residential addresses not licensed to receive OTP; shipped OTP to locations in other states near California, such as Arizona, intending that the OTP would then be smuggled into California; assisted in creating fake company names; and advised N.N. and the ATF U/C how to evade the excise tax by shipping to other locations and using different company names.

# IV. OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of the conspiracy and to accomplish its objects, defendant ALEX GOLDMAN committed and caused to be committed the following overt acts, among others, within the Eastern District of California, and elsewhere:

13.     On or about May 14, 2012, HLA shipped $139,913 worth of OTP to a warehouse in Glendale, Arizona.

14.     On or about June 12, 2012, HLA shipped $159,000 worth of OTP to a warehouse in Glendale, Arizona.

15.     On or about August 28, 2012, HLA shipped $299,716.70 worth of OTP to a warehouse in Glendale, Arizona.

16.     On or about February 20, 2013, HLA shipped $97,647.80 worth of OTP to a warehouse in Glendale, Arizona.

17.     On or about April 9, 2013, E.H. called the U/C Agent and told him that GOLDMAN was going to be in Las Vegas, Nevada, for a tobacco trade show between April 22-24, 2013, and that it would be a good opportunity for the U/C Agent to meet with GOLDMAN and "put some business together."

18.     On or about April 23, 2013, GOLDMAN met with the U/C Agent at the Bellagio Hotel in Las Vegas, Nevada. During that meeting, GOLDMAN told the U/C Agent that HLA would sell to anyone with a legitimate distributor's license. With that in mind, if the U/C Agent got another license in a different name, GOLDMAN stated he would continue to do business with the U/C Agent under that new name, and GOLDMAN would just give the U/C Agent the same discounts as before.

Dated:                                                          McGREGOR W. SCOTT
                                                                United States Attorney


                                                                _____
                                                                MICHAEL D. ANDERSON
                                                                ROSANNE L. RUST
                                                                Assistant United States Attorneys

| | |
|---|---|
| 1 | EXHIBIT "C" |
| 2 | List of Items to Be Forfeited: |

1. Approximately $4,640,000.00 in the form of a Cashier's Check,

2. Approximately $2,000,000.00 in the form of a Cashier's Check,

3. Approximately $538,155.00 Seized From ING Direct Checking Account #156773818,

4. 2011 Ferrari California Convertible, VIN: ZFF65 LJA0B 01766 22, New Jersey License Plate: NOTOUCH,

5. 2011 Audi A5 Convertible, VIN: WAULFAFH9BN009524, New Jersey License Plate: W98ARP,

6. 2013 Blue Porsche Panamera, VIN: WPOAB2A71DL060573, New Jersey License Plate: 2012ROJ,

7. Any Interest or Principal Payments associated with "Loan 1 of 2" represented by Check # 81600 for $2,500,000, payable to Drew Estates LLC dated January 2, 2011,

8. Any Interest or Principal Payments associated with "Loan 2 of 2" represented by Check # 81601 for $2,500,000, payable to Drew Estates LLC dated January 2, 2011,

9. Approximately $546,104.80 seized from Wachovia Bank Account #2000019689368 in the name of Harold Levinson and Associates, Inc.,

10. Real property located at 104 Pelican Court, Marlboro, New Jersey, Tax ID No: 412-165.02, or sub *res* in the amount of $400,000.00 in lieu of forfeiting the real property,

11. "Champagne Tango" Limited Edition, Michael Goddard, Giclee on canvas, signed by artist, Numbered 207/250, 40" X 24" including frame,

12. Marc Chagall Etching "Soleil Aux Amoureux" black & white Limited Edition Etching, signed by artists, Numbered 1 of 60, 12"x 9" including frame,

13. Joan Miro, The Perseides I, 1970, Registration No.147727.0018,

14. Joan Miro, The Perseides III, 1970, Registration No. 147727.0018,

15. Joan Miro, Oda A Joan Miro (C.905), 1973, Registration No. 177246.001,

16. Andras Markos, Abstract XV111, 2000, Registration No. 110777.0000,

17. Scott Jacobs, After the Ride, 2005, Registration No. 151835.0215,

1      18.   Scott Jacobs, Summer Red, 2005 Registration No. 151836.0423,

2      19.   Scott Jacobs, Roses or Red, 2005, Registration No. 151837.0193,

3      20.   Diamond engagement ring, CTR RD, diamond 1.90 CTS., GIA Cert 10074955, E Color,

4   SI, Plat. Mtg. with 6 top bags Wgt .65 CTS and 2 RD diamonds weighing .30 CTS,

5      21.   Diamond necklace containing 7 diamonds Wgt. 1.10 CTS. G Color, VS2 set in handmade

6   white gold necklace,

7      22.   668 Pair of diamond St. Earrings - 2 round diamonds weighing Approx. 1.50 CTS., G

8   Color, SI1, set in white gold mounting,

9      23.   Diamond bracelet containing 60 Rd diamonds, weighing 3.51 CTS., G Color, VS2, set in

10  18kt gold channel mounting,

11     24.   Cartier Roadster, stainless steel watch, S/N 699127D,

12     25.   Steel and Gold Rolex with Roman Dial, Model #R0250005, S/N

13  R79173373B6252K79897,

14     26.   Cartier platinum and diamond Star of David Charm Approx. 1.20 CTS. Fiche

15  #007262125, Ref. #HY300021, S/N 869388,

16     27.   14kt Gold and Onyx Bracelet with interconnecting Marquise stones,

17     28.   Approximately $4,740.00 in the form of a Cashier's Check in lieu of a Man's diamond

18  ring containing 3 full cut Rd. diamonds .74 CTS., Color G, VS2, set in handmade platinum setting,

19     29.   Diamond wedding ring containing 3 full cut Rd diamonds .74 CTS, Color G, VS2, set in

20  handmade platinum setting,

21     30.   Diamond Eternity Necklace containing 215 full cut round diamonds weight 2.34 CTS.,

22  diamonds are G Color, VS2 set in white gold pave necklace mounting, 17",

23     31.   Pair of diamond stud earrings containing 2 Princess cut diamonds, weighing 2.40 CTS.,

24  G-H Color, VS2, set in white gold mappings,

25     32.   Patek Philippe automatic annual calendar watch, black strap, 18kt, white gold case, grey

26  dial, Movement #3131717, Case #4096366,

27     33.   Cartier Tank Francaise Ring Wg-1/2 diamond-Ref B4054750, S/N CR0138,

28     34.   Men's Rolex stainless steel and platinum yacht master watch,

EXHIBIT C -- LIST OF ITEMS TO BE FORFEITED          2

35. Stainless steel Franck Muller Biretro chronograph watch with black alligator strap, Model #7850CCBACB,

36. Jaeger Le-Coultre Men's Grand Revell watch in platinum, leather strap, Limited Edition, Model Q163644A-12,

37. Panerai Radiomir 45mm chronograph black stainless steel watch Serial #6715PB0569224 Reference #PAM00288,

38. Parmigiani Fleurier stainless steel and black leather chronograph watch, Reference #PF003FLP1,

39. Vacheron Constantin Overseas stainless steel chronograph watch, Model #49150/B01A CAE #1158537,

40. Blancpain stainless steel chronograph perpetual calendar watch, Model #2685F1130FI Case #102,

41. IWC Big Pilot platinum watch, Model #500413, Serial #3406085,

42. IWC Mark XVI stainless steel watch, Model #325512, Serial #3355682,

43. Patek Philippe stainless steel watch with diamonds, Model #4910/10A-010, Serial #3592550/4855430,

44. Patek Philippe platinum watch with diamond, Model #5135P-001, Serial #3920424/4455746,

45. Women's Roberto Coin white gold and diamond bracelet,

46. Women's Roberto Coin white gold and diamond bracelet,

47. Roberto Coin Rose gold and diamond bracelet,

48. Men's Panerai Limior power reserve watch, 2005 Regatta - 125 of 500,

49. All commissions, remunerations, and/or payments earned or accrued from Harold Levinson and Associates, Inc. from June 1, 2013 through March 1, 2014, and

50. Approximately $10,002.00 in U.S. Currency.

EXHIBIT C -- LIST OF ITEMS TO BE FORFEITED     3